**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| **ROBERT ANTHONY ZARAGOZA,** | |
| Plaintiff, | |
| v. | Case No. EP-3-21-cv-287-KC |
| **UNION PACIFIC RAILROAD COMPANY,** | |
| Defendant. | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S**
**<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

12806128v1

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT AND AUTHORITIES.................................................................. 2

    A.    Zaragoza's Remaining ADA Claims Are Precluded by the FRSA. ...................... 2

    B.    Zaragoza's Disparate Treatment Claim Fails as a Matter of Law (Count I). ......... 6

        1.    Determining that Zaragoza did not meet FRA color vision standards is not direct evidence of discrimination................................................... 7

        2.    Zaragoza cannot meet his burden with indirect evidence either...................... 9

            a.    Zaragoza was not qualified under the ADA because he could not satisfy the FRA's mandatory color-vision standard for recertification. ........................................................... 10

                i.    Union Pacific meets the Albertson's defense because it acted under the direction of binding FRA regulations....................................................... 11

                ii.    Zaragoza's attempts to challenge the Light Cannon test fail.............................................................. 14

            b.    Regardless, Union Pacific had legitimate, non-discriminatory reasons for its actions and Zaragoza cannot prove pretext. ............................................................ 17

    C.    Zaragoza's Disparate Impact Claim Fails as a Matter of Law (Count II). ........... 18

III.    CONCLUSION................................................................................................. 20

12806128v1

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page (s)**

*Albertson's, Inc. v. Kirkinburg,*
    527 U.S. 555 (1999)..................................................................................................11, 12, 20

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.,*
    137 Fed. Appx. 694 (5th Cir. 2005)..............................................................................5

*Atkins v. Salazar,*
    677 F.3d 667 (5th Cir. 2011) ......................................................................................19

*Bates v. United Parcel Serv., Inc.,*
    511 F.3d 974 (9th Cir. 2007) (en banc) ......................................................................20

*Bey v. City of New York,*
    999 F.3d 157 (2d Cir. 2021)...................................................................................12, 17

*Bower v. Fed. Express Corp.,*
    156 F. Supp. 2d 678 (W.D. Tenn. 2001)......................................................................14

*Brown v. MCI WorldCom Network Servs., Inc.,*
    277 F.3d 1166 (9th Cir. 2002) ......................................................................................5

*Brunskill v. Kansas City Southern Ry. Co.,*
    No. 06-00205-CV-W-REL, 2008 WL 413281 (W.D. Mo. Feb. 12, 2008),
    *aff'd*, 331 Fed. Appx. 426, 2009 WL 2448265 (8th Cir. 2009).........................14, 15

*Cannizaro v. Neiman Marcus, Inc.,*
    979 F. Supp. 465 (N.D. Tex. 1997) .............................................................................10

*Carrillo v. Union Pac. R.R. Co.,*
    No. EP-21-CV-00026-FM, 2022 WL 3224000 (W.D. Tex. Aug. 9, 2022)..............................9

*Cicalese v. Univ. of Tex. Med. Branch,*
    924 F.3d 762 (5th Cir. 2019) .......................................................................................7

*Clark v. Champion Nat'l Sec., Inc.,*
    952 F.3d 570 (5th Cir. 2020) .................................................................................6, 7, 9

*Coffey v. Norfolk S. Ry. Co.,*
    23 F.4th 332 (4th Cir. 2022) ("Norfolk Southern's inquiries were compelled
    by binding FRA regulation, and we cannot fault the company for its efforts to
    comply with federal law.") .....................................................................................12, 20

*Corp. v. Green,*
    411 U.S. 792 (1973).......................................................................................................6

12806128v1

*Davis v. City of Cleveland*,
No. 1:23 CV 536, 2024 WL 837119 (N.D. Ohio Feb. 28, 2024) ...........................................12

*Fried v. Sensia Salon, Inc.*,
No. 4:13-cv-00312, 2013 WL 6195483 ........................................................................5, 6

*Gober v. Frankel Family Trust*,
537 Fed. Appx. 518 (5th Cir. 2013) ...............................................................................10

*Gonzales v. City of New Braunfels*,
176 F.3d 834 (5th Cir. 1999) .........................................................................................10

*Harris v. Dallas Cnty. Hosp. Dist.*,
No. 3:14-CV-3663-D, 2016 WL 2914847 (N.D. Tex. May 19, 2016) ......................................9

*Hinojosa v. Jostens Inc.*,
128 Fed. Appx. 364 (5th Cir. 2005) .................................................................................8

*Jones v. City of Jacksonville*,
No. 320CV01330HESJBT, 2023 WL 3595154 (M.D. Fla. Jan. 13, 2023) ............................13

*Ketcher v. Wal-Mart Stores, Inc.*,
122 F. Supp. 2d 747 (S.D. Tex. 2000) ..............................................................................9

*Kitchen v. BASF*,
952 F.3d 247 (5th Cir. 2020) ....................................................................................7, 8, 9

*Kittilsen v. Gen. Supply & Servs., Inc.*,
No. 3:18-CV-00931-E, 2020 WL 4904488 (N.D. Tex. Aug. 19, 2020) ....................................7

*Lane v. R.A. Sims, Jr.*,
241 F.3d 439 (5th Cir. 2001) .......................................................................................3, 4

*Laxton v. Gap Inc.*,
333 F.3d 572 (5th Cir. 2003) ..........................................................................................9

*In re Marlow*,
Docket No. FRA-2017-0049..........................................................................................17

*Martin v. Lennox Intern. Inc.*,
342 Fed. Appx. 15 (5th Cir. 2009)...................................................................................13

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
934 F.3d 447 (5th Cir. 2019) ..........................................................................................7

*McNelis v. Pa. Power & Light Co.*,
867 F.3d 411 (3d. Cir. 2017)......................................................................................12, 20

*Montgomery v. Union Pac. R.R. Co.*,
    848 Fed. Appx. 314 (9th Cir. 2021)......................................................................19

*Nall v. BNSF Ry. Co.*,
    917 F.3d 335 (5th Cir. 2019) .........................................................................7, 9

*Overstreet v. United Parcel Serv. Inc.*,
    No. 2:24-CV-00478-TC-DBP, 2025 WL 69189 (D. Utah Jan. 10, 2025).............................12

*In re Pendergraft*,
    Docket No. EQAL-2017-13.................................................................................17

*Peters v. Union Pac. R.R. Co.*,
    80 F.3d 257 (8th Cir. 1996) ..........................................................................3, 4

*Polak v. Sterilite Corp.*,
    No. 3:19-CV-2972-D, 2021 WL 1753757 (N.D. Tex. May 4, 2021), *aff'd*, No.
    21-10549, 2022 WL 457822 (5th Cir. Feb. 15, 2022) .............................................8

*Raytheon Co. v. Hernandez*,
    540 U.S. 44 (2003)..................................................................................7, 18

*Santiago v. YWCA of El Paso Found.*,
    No. No. EP–14–CV–247–KC, 2014 WL 3672975 (W.D. Tex. July 24, 2014).......................2

*Sears v. Zions Bancorporation NA*,
    No. 21-10448, 2022 WL 1800779 (5th Cir. June 2, 2022)......................................18

*Sharbono v. N. States Power Co.*,
    218 F.Supp.3d 1004 (D. Minn. 2016)...................................................................18

*Trautman v. Time Warner Cable Tex., LLC*,
    No. A-16-CV-1049-LY, 2017 WL 5985573 (W.D. Tex. Dec. 1, 2017) .................................10

*Trevillion v. Union Pac. R.R.*,
    No. 18-610, 2021 WL 1762112 (W.D. La., May 4, 2021) .......................................9

*Vaughn v. FedEx Freight, Inc.*,
    421 F.Supp.3d 1302 (N.D. Ala. 2019)...................................................................18

*Weeks v. Union Pac. R.R. Co.*,
    No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123 (E.D. Cal. May 3, 2017).......................3, 4

*Williams v. JB Hunt Trans. Inc.*,
    826 F.3d 806 (5th Cir. 2016) .....................................................................13, 20

## Statutes

42 U.S.C. § 12111(8) ....................................................................................10

iv

42 U.S.C. § 12112(a) ..............................................................................................6

42 U.S.C. § 12112(d)(4) ..........................................................................................9

42 U.S.C. § 12201(h) .............................................................................................19

49 U.S.C. § 20101 ....................................................................................................2

Americans with Disabilities Act (ADA)..................................................... *passim*

Federal Railroad Safety Act, 49 U.S.C. § 20100 *et seq.*................................ *passim*

**Other Authorities**

29 C.F.R. § 1630.2(m) ...........................................................................................10

29 C.F.R. § 1630.10(a) ..........................................................................................19

29 C.F.R. § 1630.14(c) ............................................................................................8

29 C.F.R. § 1630.15(e) ..........................................................................................11

49 C.F.R. Part 240 ....................................................................................................3

49 C.F.R. Part 240 App. F .....................................................................................17

49 C.F.R. Part 242 App. D .....................................................................................17

49 C.F.R. Part 242 App. D(4) ................................................................................16

49 C.F.R. Part 242, Appendix D ............................................................................17

49 C.F.R. § 242.1(a) ..............................................................................................13

49 C.F.R. §§ 242.109(a)(2), .117(b), (h)(3) ...........................................................9

49 C.F.R. § 242.117 ...............................................................................................17

49 C.F.R. § 242.117(h)(3) ......................................................................................14

49 C.F.R. §§ 242.501-511 ........................................................................................3

Fed. R. Civ. P. 56 .....................................................................................................1

Local Rule CV-7(C) .................................................................................................1

Local Rule CV-7(d)(1).............................................................................................1

v

**STATEMENT OF ISSUES**

<u>Issue No. 1:</u> Plaintiff Robert Zaragoza's ("Zaragoza" or "Plaintiff") claims for disparate treatment (Count I) and disparate impact (Count II) are precluded by the Federal Railroad Safety Act, 49 U.S.C. § 20100 *et seq*., ("FRSA") due to Zaragoza's failure to petition the Federal Railroad Administration ("FRA") to review Defendant Union Pacific Railroad Company's ("Defendant" or "Union Pacific") decision to deny his recertification as a conductor under the dispute resolution procedures contained in the FRA regulations.

<u>Issue No. 2:</u> Zaragoza's claim for disparate treatment due to an alleged disability (Count I) fails as a matter of law because he was not qualified to perform his conductor job; Union Pacific can articulate a legitimate, non-discriminatory reason for its denial of Zaragoza's FRA recertification; and Zaragoza cannot prove discriminatory intent or pretext.

<u>Issue No. 3:</u> Zaragoza's claim for disparate impact (Count II) fails as a matter of law because Zaragoza is not a "qualified" individual under the ADA, he only alleges that Union Pacific "regarded" him as disabled, and Union Pacific's color vision screening protocols are job-related and consistent with business necessity.

Defendant Union Pacific, in accordance with Fed. R. Civ. P. 56 and Local Rule CV-7(C), and this Court's March 27, 2025 Order (ECF No. 71), moves for summary judgment on Plaintiff's remaining claims of disparate treatment (Count I) and disparate impact (Count II) in violation of the Americans with Disabilities Act ("ADA").[1]

## I.     **INTRODUCTION**[2]

Robert Zaragoza worked for Union Pacific as a conductor—a safety-sensitive position governed by the Federal Railroad Administration ("FRA"). Under the FRA's regulations, conductors must pass a color vision screening test every three years in order to be recertified for their positions. The regulations specify certain tests that can be used for the initial screening (here, an Ishihara test) and give the railroad's chief medical officer the discretion to further evaluate individuals who fail the initial screening through a field test to determine if they can satisfy the FRA's color vision standards.

These FRA regulations are important as railroads use colored wayside signals that must be identified properly. If signals are misidentified, the consequences are severe—as illustrated by the 2012 Goodwell train collision. There, a locomotive engineer misidentified a signal due to a color vision deficiency and caused a fatal, head-on collision between two Union Pacific freight trains. After the accident, the National Transportation Safety Board ("NTSB") criticized Union Pacific's color vision testing program and recommended improvements.

At issue here is Union Pacific's current Color Vision Field Test ("CVFT"), known as the Light Cannon, which was developed in response to NTSB recommendations and FRA guidance

---

[1] The Court dismissed Zaragoza's claim for failure to accommodate (Count III) on June 15, 2022. *See* ECF No. 29.

[2] Appendix A contains Union Pacific's Proposed Undisputed Facts, which are attached hereto as if fully incorporated herein, and provides pinpoint citations to the supporting record. *See* Local Rule CV-7(d)(1). Such references will be cited as "SOF ¶."  Appendix B contains Union Pacific's Appendix of Evidence ("AOE") supporting this Motion and the SOF.

after the Goodwell collision. In 2016, Zaragoza failed his initial Ishihara test during his FRA recertification process and then also failed the Light Cannon—which has been observed and approved by the FRA. Because he failed to satisfy the FRA's color vision standards, Union Pacific was required to deny his FRA recertification. Nonetheless, Zaragoza now contends that Union Pacific discriminated against him in violation of the Americans with Disabilities Act ("ADA") by regarding him as disabled and wrongfully denying his FRA recertification.

In the instant lawsuit, Zaragoza originally asserted ADA claims of disparate treatment (Count I), disparate impact (Count II), and failure to accommodate (Count III). Because the Court dismissed Zaragoza's failure-to-accommodate claim as time-barred, only his disparate treatment and disparate impact claims remain. But these, too, fail for several reasons: (1) Zaragoza's remaining claims are precluded by the FRSA; (2) Zaragoza cannot establish he was qualified for his job or create a genuine dispute of fact as to whether Union Pacific's actions were pretextual; and (3) Union Pacific's color vision screening protocols are job-related and consistent with business necessity. Union Pacific is entitled to summary judgment on Zaragoza's remaining claims under the ADA; and they should be dismissed with prejudice.

## II.    ARGUMENT AND AUTHORITIES[3]

### A.    Zaragoza's Remaining ADA Claims Are Precluded by the FRSA.

The stated purpose of the FRSA "is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. "It authorizes the Secretary of Transportation to 'prescribe regulations and issue orders for every area of railroad safety []' and provides that '[l]aws, regulations, and orders *related to railroad safety* shall be

---

[3] Union Pacific incorporates the summary judgment standard stated by this Court in *Santiago v. YWCA of El Paso Found.*, No. No. EP–14–CV–247–KC, 2014 WL 3672975, at *1-*2 (W.D. Tex. July 24, 2014).

2

*nationally uniform* to the extent practicable.'" *Lane v. R.A. Sims, Jr.*, 241 F.3d 439, 442 (5th Cir. 2001) (quoting 49 U.S.C. §§ 20103(a), 20106) (emphasis in original and internal citation omitted).

Under the FRSA, the FRA "has issued administrative rules regarding [] the training and certification of locomotive engineers [and conductors]" for the purpose of ensuring "that locomotives are only operated by qualified and safe engineers [and conductors]." *Weeks v. Union Pac. R.R. Co.*, No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123, at *7 (E.D. Cal. May 3, 2017) (quoting *Carpenter v. Mineta*, 432 F.3d 1029, 1031 (9th Cir. 2005)); *see also* 49 C.F.R. Part 240. "The FRA does not actively participate in engineer [or conductor] testing or certification, but administers the regulations through approval and monitoring of individual railroads' programs, including their training and testing regimens." *Weeks*, 2017 WL 1740123, at *7.

Because the regulations were not intended to impact a railroad's relationship with its employees, "the FRA has a dispute resolution process in which each person denied engineer [or conductor] certification may obtain a fresh determination by the FRA of whether the railroad's decision was correct." *Id.* (quotation omitted). Specifically, "*[a]ny person* who has been … denied recertification … and believes that a railroad incorrectly determined that he or she failed to meet the qualification requirements of this regulation … may petition the FRA to review the railroad's decision." *Id.* (quoting 49 C.F.R § 240.401(a)); *see also* §§ 242.501-.511 (setting forth the FRA dispute resolution procedures for conductors); *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 261 (8th Cir. 1996) (recognizing that the FRA's regulations include "a specific, detailed scheme setting out dispute resolution procedures"). It is clear that the FRA intended for its dispute resolution process to provide an avenue for conductors who believe they were wrongfully denied FRA certification by their railroad employer to "obtain a fresh determination by the FRA of whether the railroad's decision was correct." *Weeks*, 2017 WL 1740123, at *7.

In *Weeks*, Union Pacific successfully opposed the plaintiff's motion for leave to amend his complaint on the grounds that adding an ADA claim would be futile because the plaintiff failed to exercise his rights under the FRA's dispute resolution process after Union Pacific denied his engineer recertification. 2017 WL 714368, at *6-7. On reconsideration, the *Weeks* court found the plaintiff's ADA claim was not precluded because he *was not* "complaining about UP's decision to deny recertification, … [UP's] training methodology or testing criteria, [or] attempting to obtain his license." *Id.* at *7. Instead, the plaintiff claimed he was unlawfully retaliated against under the ADA because Union Pacific failed to notify him of his recertification meetings as it had for the previous 18 years. *Id*. Implicit in the court's analysis was that if the plaintiff *had* argued "that UP incorrectly determined that he … failed to meet the [FRA] qualification requirements … for recertification" or challenged whether "UP's recertification decision was correct," such a claim would have been precluded by the FRSA. *Id*. (quotation omitted).

Zaragoza's claims in this action are identical to those the *Weeks* court described as "fit[ting] within the express language of the FRA's dispute resolution regulations." *Id*. Zaragoza argues that Union Pacific unlawfully refused to recertify him as a conductor despite his failed Ishihara exam because the company's CVFT does not accurately measure his ability to interpret colored wayside signals. Because Zaragoza's claims take direct issue with "UP's decision to deny recertification" and its "testing criteria," and because he failed to exercise his appeal rights under the FRA's regulations, his ADA disparate treatment and disparate impact claims are precluded by the FRSA and should be dismissed with prejudice. *Id.*; *see also* SOF ¶¶ 57-60, 67-68; *accord Lane*, 241 F.3d at 443-44 (holding FELA claim precluded by FRSA and reasoning that allowing the claim to go forward "would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless"); *Peters*, 80 F.3d at 262 ("Because Peters' conversion

claim is necessarily a challenge to Union Pacific's certification decision, it follows that the claim comes within the scope of the FRSA regulations and is preempted.").[4]

Similarly, in *Turner v. BNSF Railway Co.*, the District Court for the Northern District of Texas addressed the same issue in granted BNSF Railway's motion for judgment on the pleadings. 2023 WL 9052248 (N.D. Tex. Dec. 22, 2023), *appeal pending,* Fifth Cir. No. 24-10031. In Turner, the plaintiff was a railroad conductor, who failed his initial recertification color vision test, as well as BNSF's secondary field test.  *Id.* at *1. Based thereon, BNSF denied the plaintiff's FRA certification, but Turner did not avail himself of the FRA's regulatory dispute resolution process. *Id.* at *1-*2 (citing 49 C.F.R. §§ 242.501-511).   The Court concluded that the FRA's safety regulations precluded Turner's ADA discrimination claim. *Id.* at *2.

Because Turner, like Zaragoza, took issue with the field test administered to him and Union Pacific's resulting decision to deny recertification, the District Court found that Turner was required to avail himself of the regulatory appeals process specifically afforded to him by the FRA. *Id.* at *2-*3. Indeed:

> If conductors were permitted to challenge a railroad's testing criteria for recertification under the ADA, it would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless.  The FRA's specific, detailed scheme setting out dispute resolution procedures on this issue would be pointless and the FRSA's purpose of protecting public health and safety would be undermined.

---

[4] Even if the Court finds that the FRSA does not preclude Zaragoza's remaining claims, the Court may exercise its discretion and dismiss Zaragoza's claims under the primary jurisdiction doctrine so they can be resolved by the FRA. *See, e.g., ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 Fed. Appx. 694, 697 (5th Cir. 2005) ("The doctrine of primary jurisdiction applies either when a government agency has exclusive original jurisdiction over an issue within a case or when a court having jurisdiction wishes to defer to an agency's superior expertise."); *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002) (stating the primary jurisdiction doctrine "is properly invoked when a claim … requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency."); *Fried v. Sensia Salon, Inc.*, No. 4:13-cv-00312, 2013 WL 6195483, at *2, *6 (S.D. Tex. Nov. 27, 2013 (invoking the primary jurisdiction doctrine).

*Id*. at *3 (internal quotations and citations omitted).  Similarly:

> [W]here FRA regulations specifically govern the sufficiency of an employee's recertification testing criteria, an employee cannot challenge the railroad's testing protocol under the ADA.  Such a claim is precluded by the FRA's comprehensive administrative adjudication system for handling certification disputes.

*Id*. (internal quotations and citations omitted).  And:

> The FRA has vastly greater competence than this Court in designing field tests that mirror what conductors must see in the field.  To the extent a conductor believes they have been improperly denied recertification, their recourse is with the FRA, not under the ADA.

*Id*. (internal quotations and citations omitted). As such, Zaragoza's remaining ADA claims are precluded by the FRSA and should be dismissed with prejudice.[5]

### B.    Zaragoza's Disparate Treatment Claim Fails as a Matter of Law (Count I).

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff can prove intentional discrimination under the ADA by presenting "direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802 (1973)]." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (brackets in original and quotation omitted). To meet the direct evidence standard, Zaragoza must do more than just showcase differing medical opinions. Evidence on an employer's "subjective intent to discriminate" is "required in a 'disparate-treatment case.'"

---

[5] Here, the FRA "is in the best position to opine … on the technical and potentially far-reaching issues implicated in [Zaragoza] claims"—i.e., whether the Light Cannon is an appropriate field test for assessing the color vision acuity of railroad conductors who fail their Ishihara test. *Fried,* 2013 WL 6195483 at *4.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003). The Fifth Circuit also recognizes that disparate-treatment claims require "proof and finding of discriminatory motive." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (quotation omitted). Here, Zaragoza cannot meet his burden under either evidentiary framework.

### 1. Determining that Zaragoza did not meet FRA color vision standards is not direct evidence of discrimination.

"[D]irect evidence is rare." *Clark*, 952 F.3d at 579 (alternation in original and quotation omitted). Direct evidence in an ADA discrimination case is evidence that, "if believed, it proves the fact of 'discriminatory animus without inference or presumption.'" *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (quoting *Rodriguez v. Eli Lily & Co.*, 820 F.3d 759, 765 (5th Cir. 2016)). "If an inference is required for the evidence to be probative as to [defendant's] discriminatory animus …, the evidence is circumstantial, not direct." *Kittilsen v. Gen. Supply & Servs., Inc.*, No. 3:18-CV-00931-E, 2020 WL 4904488, at *6 (N.D. Tex. Aug. 19, 2020); *see also Nall v. BNSF Ry. Co.*, 917 F.3d 335, 341 (5th Cir. 2019).

"Most often, direct evidence takes the form of a discriminatory statement directly connected to the plaintiff's discharge." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456 (5th Cir. 2019). "In direct evidence cases, comments must meet a demanding standard because the plaintiff relies on them to prove the entire case of discrimination." *Id.* at 457 (quotation omitted). "A statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination." *Clark*, 952 F.3d at 579 (quotation omitted).

Here, Zaragoza was denied FRA recertification because he failed the Light Cannon after failing his initial Ishihara test. *See* SOF ¶¶ 56-60. Evaluating an employee's medical condition during a fitness for duty process to ensure the condition does not prevent them from performing

7

their essential job functions is neither an improper criterion nor an adverse action. "In fact, the ADA authorizes employers to inquire about an employee's ability to perform job-related functions." *Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th Cir. 2005) (citing 42 U.S.C. § 12112(d)(4)(B)); *see also* 29 C.F.R. § 1630.14(c).

Nor is this direct evidence of discrimination. The Fifth Circuit's direct evidence analysis in *Kitchen v. BASF* is instructive on this point. 952 F.3d 247, 252 (5th Cir. 2020). There, the plaintiff was fired for failing a breath alcohol test at work and claimed this was direct evidence of discrimination based on his disability—alcoholism. *Id*. Disagreeing, the Court reasoned that firing the plaintiff based on the results of his breath alcohol test "is not equivalent to firing [the plaintiff] because of a prejudice against alcoholics" because an inferential leap would be required to arrive at that conclusion. *Id*. Here, Zaragoza was removed from his position as a conductor and issued restrictions after failing the color vision portion of his FRA recertification exam. Identical to the court's analysis in *Kitchen*, Zaragoza's evidence "at most would show that [Union Pacific removed him from service and issued him restrictions] based on the results of his [Ishihara and CVFT]," both of which he "undeniably" failed. *Id*. Indeed, "[a]n inferential leap is required" to conclude that Union Pacific acted "out of discriminatory animus against [Zaragoza's color vision deficiency]." *Id*.; *see also Polak v. Sterilite Corp.,* No. 3:19-CV-2972-D, 2021 WL 1753757, at *4 (N.D. Tex. May 4, 2021), *aff'd*, No. 21-10549, 2022 WL 457822 (5th Cir. Feb. 15, 2022) (plaintiff failed to produce direct evidence that he was regarded as disabled when required to take a drug test for his employer); *Bibbs v. Motiva Enterprises LLC*, No. 1:23-CV-00315, 2024 WL 5088130 (E.D. Tex. Nov. 20, 2024) (granting employer's motion to dismiss and finding no direct evidence of discriminatory intent where employer terminated employee because a medical exam determined that he was not fit for duty and that it could provide no reasonable accommodation.).

Additionally, unlike other employment discrimination laws, an employee's medical condition may be relevant to job qualifications in a way that the employee's race, sex, or national origin almost never are. Thus, the ADA expressly allows employers to conduct job-related medical examinations and inquiries. See 42 U.S.C. § 12112(d)(4); *see, e.g., Ketcher v. Wal-Mart Stores, Inc.*, 122 F. Supp. 2d 747, 754 (S.D. Tex. 2000) (citing C.F.R. Pt. 1630 App. § 1630.14(c)); *Trevillion v. Union Pac. R.R.*, No. 18-610, 2021 WL 1762112, at *5 (W.D. La., May 4, 2021). Here, Union Pacific was required to evaluate Zaragoza's color vision acuity and to ensure he met the FRA's standards for the same. 49 C.F.R. §§ 242.109(a)(2), .117(b), (h)(3), Part. 242 App. D(2).

Concluding that Zaragoza was ineligible to be recertified under binding FRA regulations is not the same as refusing to return him to service because of discriminatory animus. Accordingly, Zaragoza cannot produce direct evidence of discrimination to support his claim. *See, e.g., Clark*, 952 F.3d at 579-82; *Kitchen*, 952 F.3d at 252; *Nall*, 917 F.3d at 339, 341; *Carrillo v. Union Pac. R.R. Co.*, No. EP-21-CV-00026-FM, 2022 WL 3224000, at *4-*5 (W.D. Tex. Aug. 9, 2022).

### 2.    Zaragoza cannot meet his burden with indirect evidence either.

To establish his *prima facie* case relying on circumstantial evidence, Zaragoza must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation to perform his job's essential functions; and (3) he suffered an adverse employment action because of his disability. *Clark*, 952 F.3d at 582 (quotation omitted). If Zaragoza makes a *prima facie* case, the burden shifts to Union Pacific to articulate a legitimate, nondiscriminatory reason for its actions. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Union Pacific's burden in this respect "is one of production, not proof, and involves no credibility assessments." *Harris v. Dallas Cnty. Hosp. Dist.*, No. 3:14-CV-3663-D, 2016 WL 2914847, at *10 (N.D. Tex. May 19, 2016). Once Union Pacific does so, the burden shifts back to Zaragoza to show that Union Pacific's stated reasons are pretext designed to mask discrimination. *Id*.

9

Zaragoza only pleads that Union Pacific "regarded" or "perceived" him as disabled under the ADA. ECF No. 1, ¶ 43. Thus, Union Pacific had no duty to accommodate his assigned medical restrictions so he could continue working as a conductor. "[T]he duty to make reasonable accommodation arises only when the individual is actually disabled; no such duty arises when the individual is merely regarded as being disabled [under] the ADA." *Cannizaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 475 (N.D. Tex. 1997) (quotation omitted); *see also Trautman v. Time Warner Cable Tex., LLC*, No. A-16-CV-1049-LY, 2017 WL 5985573, at *12 n. 2 (W.D. Tex. Dec. 1, 2017) ("Employers have no duty to accommodate employees only 'regarded as' having a disability."). To prove he is qualified, Zaragoza must therefore show he can perform his essential job functions *without* accommodation—which he cannot.

          **a.  *Zaragoza was not qualified under the ADA because he could not satisfy the FRA's mandatory color-vision standard for recertification.***

A "qualified individual" under the ADA is one "who, with or without, reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *see also* 42 U.S.C. § 12111(8); *Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 521 (5th Cir. 2013). A qualified individual is one who (1) "satisfies the requisite skills, experience, education and other job-related requirements" of the position; *and* (2) "who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *Gonzales v. City of New Braunfels*, 176 F.3d 834, 837 (5th Cir. 1999). Here, Union Pacific's conductors must be able to discriminate the colors in railroad signal displays and meet FRA color vision standards. *See* SOF ¶¶ 8-9, 11-14. Specifically, FRA regulations mandate that railroad conductors undergo and pass a color-vision screening every three years to be recertified. Zaragoza failed his initial 14-plate Ishihara test in 2016, after which Union Pacific afforded him another opportunity to obtain his required FRA certification by taking its CVFT—the Light Cannon. *See*

SOF ¶¶ 57-58. Zaragoza cannot demonstrate he was qualified for his position because he failed to obtain his FRA recertification after failing the Ishihara test and the CVFT. *See* SOF ¶¶ 57-66.

> i.   *Union Pacific meets the Albertson's defense because it acted under the direction of binding FRA regulations.*

Union Pacific has an absolute defense to an ADA claim if an action is "required or necessitated by another Federal law or regulation." 29 C.F.R. § 1630.15(e); *see, e.g., Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 577-78 (1999). Because Union Pacific's administration of the Ishihara and Light Cannon tests, and subsequent restrictions, were necessitated by FRA regulations, Zaragoza's claims fail as a matter of law.

In *Albertson's*, the plaintiff, a truck driver, was fired for failing to meet certain Department of Transportation ("DOT") vision standards. 527 U.S. at 559. After the driver obtained a DOT waiver of the vision requirement, the employer refused to reinstate him, and the driver sued under the ADA. *Id.* at 560. The Supreme Court held that the ADA requires individuals who hold jobs subject to DOT physical qualification standards must be able to satisfy those standards to be considered a qualified individual. *Id.* at 573-74 (noting when "Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law"). An employer does not have to justify an applicable regulatory standard because it need not "reinvent the [g]overnment's own wheel." *Id.* at 577. Therefore, if an employer "was entitled to enforce [the DOT's] standard as defining an essential job function[n] of the employment position … that is the end of the case, for [the employee] concededly could not satisfy it." *Id.* at 567. Indeed, without the facts relevant to the driver attaining a waiver—which is not an issue in Zaragoza's case—the Court remarked that his analysis was straightforward:

> It is crucial to [the employer's] position that [it] was not insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom

12806128v1

some accommodation may be reasonable. The job qualification it was applying was the distant visual acuity standard of the Federal Motor Carrier Safety Regulations…. *The validity of these regulations is unchallenged they have the force of law, and they contain no qualifying language about individualized determinations.*

If we looked no further, *there would be no basis to question [the employer's] unconditional obligation to follow the regulations and its consequent right to do so*. This, indeed, was the understanding of Congress when it enacted the ADA.

*Id.* at 570 (emphasis added).

Applying *Albertson's*, federal courts have unanimously affirmed dismissing employees' claims where a federal regulation required the employer to take an adverse action.[6]  *See, e.g., Bey v. City of New York*, 999 F.3d 157, 169 (2d Cir. 2021) ("At bottom, OSHA's regulations are binding [] and prohibit the accommodation that the Firefighters seek. This ends the matter."); *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022) ("Norfolk Southern's inquiries were compelled by binding FRA regulation, and we cannot fault the company for its efforts to comply with federal law."); *McNelis v. Pa. Power & Light Co*., 867 F.3d 411, 416-18 (3d. Cir. 2017) ("To the extent McNelis argues he was entitled to more process than that delineated by the NRC regulations, he is again mistaken. While PPL had an "unconditional obligation to follow the regulations," it also had a "*consequent right to do so*") (citing *Albertson's*, 527 U.S. at 570) (emphasis in original); *see also Overstreet v. United Parcel Serv. Inc*., No. 2:24-CV-00478-TC-DBP, 2025 WL 69189, at *8 (D. Utah Jan. 10, 2025) ("an ADA claim … that seeks an outcome inconsistent with DOT standards cannot survive dismissal."); *Davis v. City of Cleveland*, No. 1:23 CV 536, 2024 WL 837119, at *5 (N.D. Ohio Feb. 28, 2024) ("[A]n employer should not be required to defend its adherence to a binding federal safety regulation, even when that regulation

---

[6] This precedent holds that an individual is not qualified under the ADA when he does not possess required certification or licensure for the position, including federally mandated safety standards.

conflicts with the goals of the ADA… Cleveland must be able to enforce the OSHA regulations as written, lest it 'be required on a case-by-case basis to reinvent the Government's own wheel.'") (citing *Albertson's*, 527 U.S. at 577); *Jones v. City of Jacksonville*, No. 320CV01330HESJBT, 2023 WL 3595154, at *5 (M.D. Fla. Jan. 13, 2023) ("Plaintiffs' accommodation cannot coexist with the applicable OSHA regulation… This is a situation, as discussed in Albertsons and Bey, when the guarantees of the ADA must yield to a federal safety regulation.").

The Fifth Circuit is in accord. *See, e.g., Williams v. JB Hunt Trans. Inc*., 826 F.3d 806, 811-13 (5th Cir. 2016) (plaintiff not qualified under ADA "[b]ecause he lacked the DOT certification required by federal law"); *Martin v. Lennox Intern. Inc.*, 342 Fed. Appx. 15, 17 (5th Cir. 2009) (plaintiff was not qualified to work as a pilot because he lacked the required FAA certification at the time his employment was terminated); *Turner*, 2023 WL 9052248, at *4 ("Turner cannot show he was qualified to be a conductor because (1) he was denied recertification after failing a primary and secondary test and a determination by the medical examiner that he could not safely perform his job duties, and (2) he did not seek review of the determination under the FRA's dispute resolution procedures.").

Here, Union Pacific is legally mandated to comply with the FRA's regulations—the purpose of which is to reduce the rate and number of railroad accidents and injuries by requiring that conductors meet minimum Federal safety standards. *See* 49 C.F.R. § 242.1(a). This includes the requirement that conductors (like Zaragoza) have the ability to recognize and "distinguish between the colors of railroad signals." *Id.* at § 242.117(h)(3). In short, this requires that conductors must pass an FRA-approved test, including the Ishihara test and if they fail, Union Pacific must provide the conductor with at least one opportunity to prove they can safely perform as a

13

conductor, such as "Ophthalmologic referral, field testing, or other practical color testing." *Id*. at Part 242 App. D(4)(3).

Union Pacific followed these regulations in denying Zaragoza FRA recertification as a conductor and issuing him restrictions. ***There is no dispute*** that Zaragoza failed his Ishihara test and then proceeded to fail the CVFT administered by Union Pacific. *See* SOF ¶¶ 57-60. Therefore, because Zaragoza could not meet the standards set forth in 49 C.F.R. § 242.117(h)(3), and Union Pacific relied on those standards in denying recertification and in issuing restrictions to Zaragoza, it has an absolute defense to Zaragoza's claims.

### ii.    *Zaragoza's attempts to challenge the Light Cannon test fail.*

Zaragoza contests the denial of his FRA recertification based on his failure of the Light Cannon. Specifically, he claims it was not properly validated and did not accurately measure his ability to see and interpret colored railroad signals because he was able to pass the previous CVFT utilized by Union Pacific. His argument is meritless. Indeed, the Eighth Circuit has already addressed—and rejected—Zaragoza's argument:

> It is undisputed the [FRA] regulations do not describe how the field test is to be conducted but rather, state that the railroad may exercise its discretion to conduct the [color vision] field test in a manner of its choosing in conjunction with its medical advisor. There is no prescribed methodology for the manner in which a filed [sic] test is to be conducted.

*Brunskill v. Kansas City Southern Ry. Co*., No. 06-00205-CV-W-REL, 2008 WL 413281 at *29 (W.D. Mo. Feb. 12, 2008), *aff'd*, 331 Fed. Appx. 426, 2009 WL 2448265 (8th Cir. 2009). Because the railroad's chief medical officer believed the CVFT administered to the *Brunskill* plaintiff was an appropriate method for measuring his color vision under FRA, the court deemed this sufficient to rebut the plaintiff's ADA discrimination claim where he challenged his failure of the CVFT and resulting denial of FRA recertification. *Id*.; *see also Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678, 686-87 (W.D. Tenn. 2001).

14

Like *Brunskill*, Zaragoza's belief that the Light Cannon was not the most effective way to test his color vision is immaterial. Zaragoza and his expert assert that Union Pacific should have used a different field test or should have had the Light Cannon scientifically validated. Importantly, the FRA regulations do not require Union Pacific to use any of the alternative tests Zaragoza's expert suggests. Nor do the FRA regulations require a field test be scientifically validated. The FRA never imposed any "validation" requirement under its best practices—which it describes as merely suggestions:

> **The following best practices are intended to guide each railroad in designing, implementing, and scoring color vision field testing for locomotive engineer and conductor certification. They are broadly drafted to allow each railroad to develop field testing procedures that will work for its own operational environment and to consider the unique medical circumstances of each examinee tested.** Furthermore, these best practices will guide railroads to establish best testing practices. Of course, FRA recognizes and appreciates that some railroads already follow many of these best practices, and will readily adopt additional best practices that are viewed as making the field test more valid, reliable, and comparable. **FRA encourages each railroad to consider adopting all best practices.**

*See* AOE, Ex. F at p. 5 (UPZARAGOZA-000880). Under the FRA's best practices "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." *See* SOF ¶ 30, Ex. F. CVFTs should "reasonably match actual operating or working conditions" and may be performed while conductors stand "on the ground at distances from a signal or other object that the person must see and recognize to perform safely as a locomotive engineer or conductor." *See* SOF ¶ 29, Ex. F. Other recommendations include not employing a predictable signal sequence and testing each signal multiple times to remove the likelihood of passing with an educated guess. *See* SOF ¶ 32, Ex. F.

The FRA regulations provide that Union Pacific may use a "field test" as opposed to a "scientific screening test" as the "further medical evaluation" used to determine if an individual

meets the FRA color vision standards. 49 C.F.R. Part 242 App. D(4); *see also* AOE, Ex. F at p. 3 (UPZARAGOZA-000878) (distinguishing between a "'practical test,' more commonly known as a 'field test' within the railroad community, is a test performed outdoors under test conditions that reasonably match actual operating or working conditions" and a "scientific test" which requires "a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication"). The FRA has repeatedly referred to the Light Cannon test as a "field test." *See, e.g.,* SOF ¶ 45 (referring to CVFT as a "field test".)

Moreover, Union Pacific's Light Cannon meets the FRA suggestions regarding CVFTs. Per the FRA, "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." *See* SOF ¶ 30. The Light Cannon met the suggested criteria by (1) using signals that were substantially like those being used in the field; (2) conducting the test at a distance that approximates the distance conductors need to be able to recognize signals; (3) removing positional cues (like those present in the previous CVFT); (4) showing a proper number of individual signal lights to the examinee; and (5) used standardized testing protocols to ensure reliability and comparability. *Compare* SOF ¶¶ 29-32 *with* SOF ¶¶ 36-38.

The record also demonstrates that Union Pacific worked extensively to ensure that the Light Cannon reasonably matched actual conditions. After Drs. Ivan and Rabin prepared a report recommending changes to a prototype of the Light Cannon that was never used, Dr. Ivan testified about the work that went into the second evaluation process following the report—stating he "[saw] all of that as validation" and believed the Light Cannon "was representative of what was being used on the lines." *See* SOF ¶ 34, Ex. P.

More importantly, the FRA has expressly concluded that the Light Cannon meets the FRA standards for a valid field test. FRA safety administrators came on site at Union Pacific, evaluated

16

the CVFT in person, and raised no objection to its use.[7] *See* SOF ¶ 43. The Locomotive Engineer Review Board ("LERB"), which is responsible for reviewing petitions from locomotive engineers appealing a railroad's decision to deny certification for not meeting the color vision standards, has explicitly held that the Light Cannon is a valid field test as contemplated by the FRA regulations.[8]

> Petitioner first asserts that the "light cannon" color vision test is an improper field test, because his 12 years of experience operating a train and medical finding of a "very mild" red/green color vision deficiency demonstrate he can safely operate a locomotive. The Board disagrees. Based on the materials submitted by both Petitioner and UP, the Board finds that the "light cannon" field test is an adequate field test as contemplated by 49 C.F.R. Part 240, Appendix F, paragraph (4).

AOE, Ex. L (*In re Pendergraft*, Docket No. EQAL-2017-13, p. 3 (Nov. 10, 2017) (UPZARAGOZA-000885); *see also* Ex. N (*In re Marlow*, Docket No. FRA-2017-0049, p. 4 (Jan. 17, 2018) (holding "UP's conduct [in using the Light Cannon] was in accordance with 49 C.F.R. § 242.117 and 49 C.F.R. Part 242, Appendix D.") (UPZARAGOZA-000956).

Lastly, Zaragoza's years of prior employment as a conductor and passage of the previous CVFT are immaterial. These arguments are directly contrary to the FRA's color vision acuity requirements. Indeed, the Goodwell collision and the responses from the NTSB and FRA illuminate the danger in Zaragoza's argument. *See, e.g., Bey*, 999 F.3d at 161-62, 168. Zaragoza failed to satisfy the FRA's color vision standards necessary for recertification as a conductor. Thus, he was not "qualified" under the ADA and his disparate-treatment claim fails as a matter of law.

> **b.  Regardless, Union Pacific had legitimate, non-discriminatory reasons for its actions and Zaragoza cannot prove pretext.**

Zaragoza must also prove Union Pacific's discriminatory intent, i.e., pretext designed to

---

[7] The FRA's former Specialist of Operating Crew Management, Joseph Riley, testified that on learning about the Light Cannon, he "saw nothing that would warrant a violation of anything." *See* SOF ¶ 44; *see also* SOF ¶¶ 47-48.

[8] Locomotive engineers and conductors must pass the same tests to meet the FRA standards and Union Pacific uses the same Light Cannon for both. *Compare* 49 C.F.R. Part 240 App. F, *with* 49 C.F.R. Part 242 App. D; *see also* SOF ¶¶ 10-11.

mask discrimination. *See, e.g., Raytheon Co.*, 540 U.S. at 52-55. "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Sears v. Zions Bancorporation NA,* No. 21-10448, 2022 WL 1800779, at *3 (5th Cir. June 2, 2022) (quoting *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 220 (5th Cir. 2001)).

Here, Union Pacific denied Zaragoza's FRA recertification and issued restrictions for one reason—to comply with FRA safety regulations. Zaragoza understood this and was subjected to the same FRA-mandated color vision testing as every other conductor who works for Union Pacific. Because Zaragoza failed his Ishihara test and Union Pacific's CVFT, Union Pacific was unable to recertify him as a conductor in accordance with FRA regulations and could not return him to his conductor position. Indeed, Union Pacific told Zaragoza that his FRA recertification was denied for failing to meet the FRA's vision standards. *See* SOF ¶ 60. Adhering to the FRA's binding regulations regarding the color-vision standards for conductors was a legitimate, non-discriminatory reason for not returning Zaragoza to service. And Zaragoza presents no evidence demonstrating this good-faith adherence to federally mandated regulations was pretext for intentional discrimination. *See, e.g., Vaughn v. FedEx Freight, Inc*., 421 F.Supp.3d 1302, 1310-12 (N.D. Ala. 2019); *Sharbono v. N. States Power Co*., 218 F.Supp.3d 1004, 1019 (D. Minn. 2016).

### C.    Zaragoza's Disparate Impact Claim Fails as a Matter of Law (Count II).

Under §12112(b)(6), employers are prohibited from "using qualification standards … that screen out or tend to screen out an individual with a disability … unless the standard, test or other selection criteria … is shown to be job-related and consistent with business necessity." Here, Zaragoza's claim fails because he (1) cannot establish he was a qualified individual, (2) only alleges that Union Pacific regarded him as disabled, and (3) Union Pacific's color vision screening protocols are job-related and consistent with business necessity.

12806128v1

To succeed on his disparate impact claim, Zaragoza must show he is a qualified individual. *Montgomery v. Union Pac. R.R. Co.*, 848 Fed. Appx. 314, 315 n.2 (9th Cir. 2021). As discussed above, Zaragoza was not qualified for his position—precluding his claim as a matter of law.

Moreover, Zaragoza's Complaint only alleges he was disabled under the ADA because Union Pacific "regarded" him as such. ECF No. 1, ¶ 43. While being regarded as disabled can form the basis of an ADA *disparate treatment* claim, the same is not true for an ADA *disparate impact* claim. The ADA and its accompanying regulations specify that employers cannot use selection criteria that screen out individuals "on the basis of [a] disability." 29 C.F.R. § 1630.10(a). Indeed, 29 C.F.R. § 1630.10(a) does not mention selection criteria that screen out or tend to screen out individuals who are "regarded as" disabled, nor would it make sense to do so. If an individual is only mistakenly perceived as having an impairment—and does not have an actual impairment—they would logically not be "screened out" by alleged discriminatory selection criteria in the same way that individuals with actual disabilities would. Zaragoza is not alleging that he suffered an adverse action because of an actual disability; to the contrary, his theory is that Union Pacific erred in removing him because he has no disability at all. This attempt to place a square peg into a round hole simply does not fit within the ADA's disparate impact framework.

Finally, "[t]o show a business necessity defense, a defendant must prove by a preponderance of the evidence that its qualification standards are: (1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation."[9] *Atkins v. Salazar*, 677 F.3d 667, 681-82 (5th Cir. 2011). Union Pacific's color vision screening protocol is "job-

---

[9] An employer is not required to reasonably accommodate an employee who is regarded as disabled. *See* 42 U.S.C. § 12201(h).

related for the position in question and is consistent with business necessity" because it is *mandated* by the FRA. *Albertson's*, 527 U.S. at 568 (noting the class of plaintiffs "accepts, as [they] must, that [defendant] may lawfully exclude individuals who fail the DOT test from positions that would require them to drive DOT-regulated vehicles."); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) (en banc) (distinguishing between a mandatory DOT safety regulation that an employer need not justify and the defendant's discretionary imposition of the same standard on vehicles to which it does not apply); *Coffey*, 23 F.4th at 332 ("complying with … legally binding federal regulation is, by definition, a business necessity").

Union Pacific is not "insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable." *Albertson's*, 527 U.S. at 570. Instead, the job qualification Union Pacific applied to Zaragoza is the FRA's requirement that conductors have sufficient color vision acuity to obtain recertification under the FRA—and this requirement is "binding" on Union Pacific. Indeed, multiple circuits have declined "to force a choice [on employers] between the rock of ADA liability and the hard place of regulatory violation." *Coffey*, 23 F.4th at 340; *McNelis*, 867 F.3d at 416 n.2 (refusing to force employer "to pick between ADA liability on one hand and administrative penalties on the other"); *Williams*, 826 F.3d at 811 (declining to make employers "face the dilemma of risking ADA liability or violating the DOT's command"). Because Union Pacific's color vision screening protocols are mandated by federal regulation, they are—as a matter of law—job-related and consistent with business necessity.

## III.   <u>CONCLUSION</u>

For these reasons, the Court should grant Union Pacific summary judgment on Zaragoza's remaining claims of disparate treatment (Count I) and disparate impact (Count II) under the ADA.

12806128v1

Respectfully submitted this 28th day of April 2025,

<div style="margin-left:50%">

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

*/s/ Lara C. de Leon*
Lara C. de Leon (TX #24006957)
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (210) 920-2310
ldeleon@constangy.com

Katherine I. Serrano (TX #24110764)
1250 S. Capital of Texas Hwy,
Building 3, Suite 400
Austin, TX 78746
Telephone: (512) 382-8808
kserrano@constangy.com
***Attorneys for Defendant***
***Union Pacific Railroad Company***

</div>

## CERTIFICATE OF SERVICE

I certify that on the 28th day of April, 2025 the foregoing was filed electronically with the Court, which served all counsel of record using its ECF notification system.

<div style="margin-left:50%">

*/s/ Lara C. de Leon*
Lara C. de Leon

</div>

21