UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| **ROBERT ANTHONY ZARAGOZA,**<br><br>      Plaintiff,<br><br>v.<br><br>**UNION PACIFIC RAILROAD COMPANY,**<br><br>      Defendant. | Case No. EP-3-21-cv-287-KC |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S REPLY IN SUPPORT OF
<u>ITS RENEWED MOTION FOR SUMMARY JUDGMENT</u>[1]**

---

[1] In advance of filing this reply, Defendant filed an Unopposed Motion for Leave to Exceed Page Limitation by an additional 3 pages. Plaintiff consented to Defendant's request. At the time of the filing of this reply the Court has not entered an order granting Defendant's request to exceed the page limitation. To ensure the timely filing of this reply, Defendant has proceeded with the filing of this brief.

## TABLE OF CONTENTS

ARGUMENT AND AUTHORITIES ................................................................................................ 1

    I.     As *Turner* Makes Clear, Zaragoza's ADA Claims are Precluded by the FRSA. .......... 1

    II.    Zaragoza's Disparate Treatment Claim Still Fails as a Matter of Law......................... 3

        A.    Zaragoza Fails to Present Direct Evidence of Discrimination Under the ADA. 3

        B.    Regardless, Zaragoza Cannot Prove He Is Qualified Under the ADA. ............. 6

            1.    Zaragoza cannot ignore the FRA's mandatory color vision standard......... 6

            2.    Zaragoza's work history and previous certifications are irrelevant............ 7

            3.    The Light Cannon is an appropriate "field test" under FRA regulations. .. 8

    III.   Zaragoza Fails to Articulate a Triable Issue on His Disparate Impact Claim. ........... 11

CONCLUSION ............................................................................................................................. 12

## TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Albertson's, Inc. v. Kirkingburg*,
  527 U.S. 555 (1999) ................................................................................................... 7, 11

*Atkins v. Salazar*,
  677 F.3d 667 (5th Cir. 2011) ............................................................................................ 11

*Baker v. Union Pac. R.R. Co.*,
  580 F.Supp.3d 647 (D. Neb. 2022) .................................................................................... 4

*Bates v. UPS*,
  511 F.3d 974 (9th Cir. 2007) .......................................................................................... 7, 8

*Brasier v. Union Pac. R.R. Co.*,
  No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 129534 (D. Ariz., Jan. 9,
  2023) ................................................................................................................................... 4

*Campbell v. Union Pac. R.R. Co.*,
  No. 4:18-cv-00522-BLW, 2020 WL 5300734 (D. Idaho, Sept. 4, 2020) ............................ 4

*Cannizaro v. Neiman Marcus, Inc.*,
  979 F. Supp. 465 (N.D. Tex. 1997) .................................................................................... 6

*Coffey v. Norfolk S. Ry. Co.*,
  23 F.4th 332 (4th Cir. 2022) ............................................................................................... 7

*Donahue v. Union Pacific Railroad Company*,
  Case No. 3:21-cv-00448 (N.D. Cal., May 13, 2025) (**Exhibit B**) ............................ 5, 7, 8

*Fried v. Sensia Salon, Inc.*,
  No. 4:13-cv-00312, 2013 WL 6195483 (S.D. Tex. Nov. 27, 2013) .................................... 3

*Fulbright v. Union Pac. R.R. Co.*,
  No. 3:20-CV-2392-BK, 2022 WL 2022 ............................................................................. 4

*Hamilton v. Ortho Clinical Diagnostics*,
  No. 4:12CV00670 JLH, 2014 WL 2968497 (E.D. Ark., July 2, 2014) .............................. 4

*Harris v. P.A.M. Transp., Inc.*,
  339 F.3d 635 (8th Cir. 2003) .............................................................................................. 7

*Hawkins v. Schwan's Home Service, Inc.*,
  778 F.3d 877 (10th Cir. 2015) ............................................................................................ 7

*Kitchen v. BASF*,
  952 F.3d 247 (5th Cir. 2020) .............................................................................................. 5

*Littlefield v. Nevada, ex. rel. Dpt. Of Public Safety*,
    195 F.Supp.3d 1147 (D. Nev. 2016) ............................................................................................8

*Martin v. Lennox Intern. Inc.*,
    342 Fed. Appx. 15 (5th Cir. 2009) ...............................................................................................7

*McNelis v. Pa. Power & Light Co.*,
    867 F.3d 411 (3d. Cir. 2017) .......................................................................................................7

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014) ................................................................................................................2, 3

*Sanders v. Union Pac. R.R. Co.*,
    No. 4:20CV3023, 2021 WL 4783629 (D. Neb., Oct. 7, 2021) ....................................................4

*Turner v. BNSF Railway Co.*,
    Case No. 24-10031 (5th Cir., May 14, 2025) (**Exhibit A**) ............................................... *passim*

*Wantou v. Wal-Mart Stores Tex., L.L.C.*,
    23 F.4th 422 (5th Cir. 2022) ......................................................................................................12

*Weeks v. Union Pac. R.R. Co.*,
    No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123 (E.D. Cal. May 3, 2017) ..........................1, 2

*Williams v. JB Hunt Trans. Inc.*,
    826 F.3d 806 (5th Cir. 2016) .......................................................................................................7

**Statutes**

42 U.S.C. § 1981a(b)(1) ...................................................................................................................12

42 U.S.C. §12112(b)(6) ...................................................................................................................11

ADA ........................................................................................................................................ *passim*

Federal Railroad Safety Act ..............................................................................................................1

FRSA ............................................................................................................................................1, 3

**Other Authorities**

29 C.F.R. Pt. 1630 App. § 1630.14(c) ..............................................................................................4

29 C.F.R. §1630.2(m) .......................................................................................................................6

29 C.F.R. § 1630.10(a) ....................................................................................................................11

Plaintiff Robert Zaragoza attempts to defeat summary judgment by asking the Court to pretend that Defendant Union Pacific ("UP") has no obligations to comply with the Federal Railroad Safety Act ("FRSA") or the Federal Railroad Administration's ("FRA") regulations that govern Zaragoza's position. Zaragoza all but suggests UP should have permitted him to continue working as a railroad conductor despite failing to obtain his FRA recertification because he was <u>previously</u> able to recertify under the FRA by passing UP's <u>former</u> color vision field test ("CVFT") – the very test that was criticized following the Goodwell, Oklahoma train collision. When Zaragoza could not later pass the <u>revised</u> CVFT, which was developed following the NTSB's directive under the discretion afforded by the FRA regulations, he argues the test was not valid and he was subject to discrimination.

As argued in UP's Motion and further supported by recent Fifth Circuit authority, Zaragoza's ADA claims fail because they are precluded by the FRSA. *See Turner v. BNSF Railway Co.,* Case No. 24-10031 (5th Cir., May 14, 2025) (**Exhibit A).** Zaragoza also fails to produce direct evidence of discrimination or prove he was "qualified" under the ADA; and Union Pacific's color vision protocols are—by law—job-related and consistent with business necessity. Summary judgment should be granted in UP's favor.

## ARGUMENT AND AUTHORITIES

**I.     As *Turner* Makes Clear, Zaragoza's ADA Claims are Precluded by the FRSA.**

As previously outlined, the FRA provides aggrieved employees with an extensive appeals process, which Zaragoza did not follow. Zaragoza's Opposition called UP's reliance on the *Turner* case "imprudent" – yet that case is directly applicable.

Zaragoza does not dispute the FRA "has a dispute resolution process in which a person denied … certification may obtain a fresh determination by the FRA." *Weeks v. Union Pac. R.R. Co.*, No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123, at *7 (E.D. Cal. May 3, 2017); 49 § C.F.R

1

240.401(a)); § 242.501. Nor does he dispute he failed to take advantage of this process. It thus follows that Zaragoza's discrimination claims fail. As the *Turner* court noted: "If Turner believes that he deserves certification despite BNSF's efforts to comply with the rules, he must go to the font of that decision- and rule-making authority: the FRA. <u>That is why this court has required administrative exhaustion in cases like this where an employment action was based on the failure to satisfy standards established by statute or regulation.</u>" Exh. A, p.10 (emphasis added).

Zaragoza's Opposition asserts arguments now rejected by *Turner* and attempts to convince this Court to follow nonbinding decisions to find otherwise. Here, the FRA intended for its dispute resolution process to provide an avenue for conductors who believe they were wrongfully denied FRA certification to "obtain a fresh determination by the FRA of whether the railroad's decision was correct." *Weeks v. Union Pac. R.R. Co.,* 2017 WL 1740123, at *7. "This exhaustion requirement is especially important if a plaintiff alleges that a federal regulation, or a private party's administration of it, might violate a nondiscrimination statute like the ADA." *Turner,* Exh. A, p. 10. And while Zaragoza attempts to broadly paint his claim as "concerning [UP's] FFD policies, not [UP's] application of FRA testing procedures," the crux of his claim takes direct issue with UP's decision not to recertify him as a conductor based on his inability to pass the Ishihara color-vision exam and its CVFT.

Further, Zaragoza's reliance on *POM Wonderful LLC v. Coca-Cola Co.,* 573 U.S. 102 (2014) is misplaced as that case is clearly distinguishable. First, the two acts analyzed in *POM Wonderful* complimented one another given their relation to food and beverage labeling. *Id*. at 106. Here, the FRA and the ADA have no such similarities, as one act examines railroad safety, while the other is a civil rights law that prohibits disability discrimination. Next, the *POM Wonderful* court raised concerns about lack of protection and remedial actions if one act was precluded by the

2

other—that is not a concern here. *Id*. at 108. Both the FRA and the ADA have clear procedures for redress and afford protections that will not leave an aggrieved party without an avenue to bring or challenge claims. Plainly stated, *POM Wonderful* is not applicable here.

For these reasons, Zaragoza's claim are precluded by the FRSA and should be dismissed.[2]

## II.   Zaragoza's Disparate Treatment Claim Still Fails as a Matter of Law.

Zaragoza cannot show that UP acted with discriminatory intent through direct evidence, nor can he show that its decision to remove him from service was pretext for discrimination. He also has failed to show he is a "qualified individual with a disability," a crucial prima facie element of his discrimination claim.  All of which doom his claims.

### A.   **Zaragoza Fails to Present Direct Evidence of Discrimination Under the ADA.**

Zaragoza contends there was direct evidence of discrimination because "multiple statements" by UP's CMO Dr. Holland during the FFD evaluation "'directly related" to Zaragoza's protected characteristic. ECF No. 74, p. 8. However, his argument fails to acknowledge that the Fifth Circuit has made clear that evaluating an employee's medical condition during an FFD process to ensure the condition does not prevent them from performing their essential job functions is neither an improper criterion nor an adverse action.  *See* ECF 73, p.15 (quoting *Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th Cir. 2005) and 29 C.F.R. § 1630.14(c)).

Ignoring this, Zaragoza argues that "multiple courts agree" that removing an employee from service who fails to satisfy mandatory FRA color vision standards is direct evidence of discrimination. ECF No. 74, p.7. Yet none of these cases stand for this proposition, nor do they

---

[2] Zaragoza also fails to cite any precedent from this Circuit supporting his position that it would be "inappropriate" for the Court to exercise its discretion and dismiss his claims under the primary jurisdiction doctrine. ECF No. 74, pp.3-4. Here, the FRA "is in the best position to opine … on the technical and potentially far-reaching issues implicated in [Zaragoza] claims"—i.e., whether the Light Cannon is an appropriate field test for assessing the color vision acuity of railroad conductors who fail their Ishihara test. *Fried v. Sensia Salon, Inc.*, No. 4:13-cv-00312, 2013 WL 6195483, at *4 (S.D. Tex. Nov. 27, 2013).

3

involve a plaintiff who was removed from service after failing to meet legally binding standards applicable to their positions. *See, e.g., Fulbright v. Union Pac. R.R. Co.,* No. 3:20-CV-2392-BK, 2022 WL 2022 WL 975603, at *2 (N.D. Tex., March 31, 2022) (Senior Communications Technician was removed from service to undergo a FFD evaluation after taking Trazodone and falling asleep when he was supposed to be "on call."); *Brasier v. Union Pac. R.R. Co.,* No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 129534, at *1-2 (D. Ariz., Jan. 9, 2023) (conductor required to undergo a FFD evaluation after brain surgery and before returning to work); *Baker v. Union Pac. R.R. Co.*, 580 F.Supp.3d 647, 652 (D. Neb. 2022) (switchman removed from service to undergo a FFD evaluation after self-reporting headaches and dizziness); *Sanders v. Union Pac. R.R. Co.*, No. 4:20CV3023, 2021 WL 4783629, at *2 (D. Neb., Oct. 7, 2021) (foreman general was removed from service to undergo a FFD evaluation after suffering cardiac arrest and being diagnosed with acute kidney failure during ulcer surgery); *Campbell v. Union Pac. R.R. Co.*, No. 4:18-cv-00522-BLW, 2020 WL 5300734, at *1 (D. Idaho, Sept. 4, 2020) (trainman removed from field training to undergo FFD evaluation after supervisor observed him limping); *Hamilton v. Ortho Clinical Diagnostics*, No. 4:12CV00670 JLH, 2014 WL 2968497, at *1 (E.D. Ark., July 2, 2014) (plaintiff was a field engineer who was terminated after taking medical leave for a work-related back injury and being issued permanent lifting restrictions). Further, *Fulbright*, *Brasier*, *Baker*, *Sanders* and *Campbell* are also flawed to the extent they ignore UP's express ability under the ADA "to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Pt. 1630 App. § 1630.14(c).[3]

---

[3] Separately, the findings of direct evidence in *Brasier*, *Baker* and *Sanders* relied on alleged admissions or concessions by UP that have not been made in this case.

4

Zaragoza's direct evidence argument presumes Dr. Holland issued restrictions because of his color vision deficiency <u>itself</u> rather than his correlating inability to satisfy federally mandated vision standards for his position. This presumption requires an inference—the antithesis of direct evidence. *Accord Kitchen v. BASF,* 952 F.3d 247, 252 (5th Cir. 2020) (firing employee based on the results of his breath alcohol test "is not equivalent to firing [the plaintiff] because of a prejudice against alcoholics" because an inferential leap would be required to arrive at that conclusion.); *Donahue v. Union Pacific Railroad Company*, Case No. 3:21-cv-00448 (N.D. Cal., May 13, 2025) (**Exhibit B**) (granting summary judgment to UP and finding that documents signed by UP's CMO containing the language "color vision deficit" was not direct evidence of discrimination).

Also inapposite here is the four-factor used by the court in *Etienne v. Spanish Lake Truck & Casino Plaza, LLC* "[t]o determine whether comments in the workplace constitute direct evidence or only stray remarks." 778 F.3d 473, 476 (5th Cir. 2015) (quotation omitted). In *Etienne*, the Fifth Circuit held that an affidavit of a former manager constituted direct evidence of race and color-based discrimination for purposes of summary judgment because it contained statements demonstrating the plaintiff's manager allocated responsibilities to employees based on the color of their skin and believed the plaintiff was "too black" to perform various tasks. *Id*. at 476. In short, Zaragoza attempts to compare Dr. Holland's references to his "color vision deficit" and "hereditary color vision deficiency" in various FFD documents to an affidavit stating that an employee was "too black" to perform various job duties. *Id*. This comparison is illogical and misplaced. <u>First</u>, Dr. Holland's reference to Zaragoza's his "color vision deficit" and "hereditary color vision deficiency" as opposed to his FRA disqualification *based on* his color vision deficit is a distinction without a difference. <u>Second</u>, Zaragoza's distorted analogy ignores fundamental differences between the ADA and other employment discrimination statutes, including Title VII.

Unlike other employment discrimination laws, an employee's medical condition may be relevant to job qualifications in a way that the employee's race, sex, or national origin almost never are. Here, UP was *required* to evaluate Zaragoza's color vision acuity and to ensure he met the FRA's standards for the same, and referencing a condition is a by-product of that requirement. Thus, Zaragoza has failed to show direct evidence of discrimination.

### B.     Regardless, Zaragoza Cannot Prove He Is Qualified Under the ADA.

Zaragoza only pleads that UP "regarded" or "perceived" him as disabled under the ADA. Thus, UP had no duty to accommodate his medical restrictions so he could continue working as a conductor. "[T]he duty to make reasonable accommodation arises only when the individual is actually disabled; no such duty arises when the individual is merely regarded as being disabled [under] the ADA." *Cannizaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 475 (N.D. Tex. 1997) (quotation omitted). Thus, to prove he is "qualified", Zaragoza must show he can perform his essential job functions <u>without</u> accommodation—which he cannot.

#### 1.     *Zaragoza cannot ignore the FRA's mandatory color vision standard.*

EEOC regulations make clear that a qualified individual is one who "satisfies the requisite skills, experience, education and other job-related requirements" of the position. 29 C.F.R. §1630.2(m). Here, it is undisputed that UP's conductors must be able to discriminate the colors in railroad signal displays and meet FRA color vision standards. FRA regulations mandate that railroad conductors pass a color-vision screening every three years to be recertified. It is also undisputed that Zaragoza failed his initial 14-plate Ishihara test in 2016, after which UP afforded him the opportunity to take its CVFT—the Light Cannon. Finally, it is undisputed that Zaragoza failed the CVFT and, as a result, UP denied his FRA recertification.

Citing *Bates v. UPS*, 511 F.3d 974, 988 (9th Cir. 2007), Zaragoza asks the Court to ignore the FRA's mandatory color vision standards for conductors and overlook his inability to be

6

recertified because UP "is the arbiter of whether Zaragoza could be certified." ECF No. 74, p.11. Zaragoza's reliance on *Bates* is misplaced. In *Bates*, the employer (of its own volition) required its non-DOT drivers to meet the same regulatory hearing standard applicable to its DOT-drivers. 511 F.3d at 988. As such, the court determined the employer's self-imposed standard was "facially discriminatory"—analogizing it to an employer's *sua sponte* policy requiring employees to be "100%" or "fully healed" before returning to work. *Id*. (quotations omitted). Here, unlike in *Bates*, there is no dispute the conductor position is governed by binding FRA regulations—including regulations for color-vision acuity.

Zaragoza also attempts to minimize extensive precedent which—relying on *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999) —holds an individual is not "qualified" under the ADA when they do not possess the required certification or licensure for their positions, including federally mandated safety standards. *See e.g., Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022); *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 416-18 (3d. Cir. 2017); *Williams v. JB Hunt Trans. Inc.*, 826 F.3d 806, 811-13 (5th Cir. 2016); *Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877, 895 (10th Cir. 2015); *Martin v. Lennox Intern. Inc.*, 342 Fed. Appx. 15, 17 (5th Cir. 2009); *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 639 (8th Cir. 2003).

As the Fifth Circuit has stated, "we refuse to force employers into a choice between the rock of ADA liability and the hard place of regulatory violation." *Turner*, Exh. A, p. 10. So too should this court, and find that Zaragoza was not qualified under the ADA.

### 2.    *Zaragoza's work history and previous certifications are irrelevant.*

Zaragoza suggests his inability to be recertified in 2016 can be ignored because he "worked nearly 10 years without incident" and was able to pass UP's previous CVFT as well as a Farnsworth D-15 exam with Dr. Schecter. *See* ECF No. 74, pp.11-12. The court in *Donahue* was also not persuaded by this same argument when the plaintiffs attempted to rely on their work

7

history too. *See Donahue* (Exh. B) at pp.10-11. Again, these arguments are immaterial and contrary to the FRA's color vision acuity requirements with which UP is legally mandated to comply. As Zaragoza has even recognized, the Farnsworth D-15 exam is <u>not</u> included in the FRA's list of approved screening test, unlike the Light Cannon test which meets the FRA's requirements for field tests. He also ignores the FRA and NTSB's responses to the Goodwell collision <u>criticizing</u> UP's use of its previous CVFT and instructing UP to replace it. Moreover, the non-binding precedent Zaragoza cites from the Eighth and Ninth Circuits, including *Bates*, are distinguishable and fail to support his position.

For example, the court in *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, relied on the plaintiff's testimony that "he maintained a forklift license" and the defendant's concession that it "<u>had no minimum vision acuity requirement</u> for driving a forklift" in finding there was sufficient evidence he could perform the essential job functions of a warehouse loader. 439 F.3d 894, 901 (8th Cir. 2006) (emphasis added); *see also Littlefield v. Nevada, ex. rel. Dpt. Of Public Safety*, 195 F.Supp.3d 1147, 1156-57 (D. Nev. 2016) (facially discriminatory binocular vision requirement was a "blanket safety-based qualification standard—beyond the essential job function—<u>that is not mandated by law</u>…") (emphasis added). Similarly, in *EEOC v. BNSF Ry. Co.*, the defendant "[made] no attempt to argue that [the plaintiff] was not [qualified]" and "conceded that the medical information it had on [the plaintiff] at the time" demonstrated he could perform the position for which he received a conditional job offer. 902 F.3d 916, 927 (9th Cir. 2018).

### 3.  **The Light Cannon is an appropriate "field test" under FRA regulations.**

Zaragoza also claims the Light Cannon test is invalid and "does not comply with FRA regulations for the development and implementation of color-vision tests." ECF No. 74, p.16.[4]

---

[4] Indeed, if Zaragoza wished to challenge the validity of the Light Cannon test, his recourse is to seek appeal

Zaragoza's arguments are circular and mischaracterize the undisputed evidence. On the one hand, he agrees that FRA regulations "include a requirement that railroads determine whether employees can recognize and distinguish colored railroad signals" and "grant[] [UP] discretion in developing tests" to assess the color vision of conductors. *Id.*, p.14. He also agrees "the FRA leaves the development of the subsequent testing process <u>to the railroad</u>" if a conductor fails a threshold assessment (such as the 14-plate Ishihara test), "merely stating that such testing should take the form of ophthalmological referral, <u>field testing</u>, or other practical color testing." *Id*. (emphasis added). Nonetheless, he claims this discretion would allow a jury to find that UP's color vision policies "are its own" and cannot be shielded by the FRA's regulations.

Despite acknowledging the FRA does not mandate specific testing protocols, Zaragoza argues UP's CVFT does not satisfy unspecified "minimum standards for field and scientific testing." *Id*. Specifically, he paints the Light Cannon as a "scientific test" for which FRA guidance requires "a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication." *Id.*, p.15. But this is <u>contrary</u> to the FRA guidance Zaragoza attempts to rely on—which describes a "practical" or "field" test within the railroad community as one that, like the Light Cannon, is performed outdoors under testing conditions that reasonably match actual operating or working conditions. Zaragoza also fails to discuss that the FRA has repeatedly referred to the Light Cannon test a "field test."

Zaragoza also erroneously argues that UP "failed to validate [the Light Cannon] per FRA regulations." *See* ECF No. 74, p.14. Yet, the FRA never imposed any "validation" requirement under its best practices—which are "intended to guide" railroads and "broadly drafted to allow

---

with the FRA, which he admittedly did not do. *See Turner,* Exh. A, p.8 ("although portions of the certification process are implemented by railways themselves… the process—including vision test approval, is within the province of the FRA… This requirement is *not* optional" for the railroad companies.).

9

each railroad to develop field testing procedures that will work for its own operational environment and to consider the unique medical circumstances of each examinee tested." *See* ECF No. 73, p.22; AOE Ex. F, p.5. Plus, "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." *See* ECF No. 73, p.22; SOF ¶30.[5]

Contrary to this unsupported assertion, the undisputed record demonstrates that UP worked extensively to ensure that the Light Cannon reasonably matched actual conditions. After Drs. Ivan and Rabin prepared a report recommending changes to a *prototype* of the Light Cannon that was never used, the doctors testified that the test was "was representative of what was being used on the lines" and "a valid field test which simulates their real-world demands." *See* ECF No. 74. p.16.

Finally, Zaragoza also suggests the Court should ignore the FRA's express approval of the Light Cannon because "there is no evidence in the record that the FRA ever completed an evaluation of the test or produced any assessment of its validity." ECF No. 74, p.16. Zaragoza fails to cite or offer any authority suggesting the FRA is prohibited from finding a field test complies with its own regulations without "validating" it; and he also ignores that FRA safety administrators evaluated the Light Cannon in person and when Joseph Riley, former Specialist of Operating Crew Management in the FRA's operating practices division, learned about the Light Cannon, he "saw nothing that would warrant a violation of anything." *See* ECF 73-1, ¶¶ 43-44.

Zaragoza's personal beliefs that UP should have used a different field test or scientifically validated the Light Cannon before using it are immaterial and—importantly—not required by the FRA. Zaragoza failed to satisfy the FRA's color vision standards necessary for recertification as a conductor. He is not "qualified" under the ADA and his disparate treatment claim fails.

---

[5] Accord *Turner*, Exh. A, p.7 (citing Best Practices, the "test conditions must 'reasonably match' the operating and working conditions the conduct will experience in the field, which differ between railways.").

10

### III. Zaragoza Fails to Articulate a Triable Issue on His Disparate Impact Claim.

Zaragoza's Opposition overlooks that 42 U.S.C. §12112(b)(6) does not contemplate claims brought by ADA plaintiffs who are "regarded" as disabled. Indeed, 29 C.F.R. § 1630.10(a) does not mention selection criteria that screen out or tend to screen out individuals who are "regarded as" disabled, nor would it make sense to do so. If an individual is only mistakenly perceived as having an impairment—and does not have an actual impairment—they would logically not be "screened out" by alleged discriminatory selection criteria in the same way that individuals with actual disabilities would. Here, Zaragoza alleges that he was incorrectly "perceived" by Dr. Holland and UP as having a color vision deficit and was issued work restrictions on that basis; but fails to articulate how being incorrectly perceived as having a color vision deficit resulted in him being unlawfully screened out by company's color-vision protocols. ECF No. 74, pp. 10, 19.

Regardless, Zaragoza cannot prove he is qualified under the ADA (see *supra*) and UP's color-vision screening protocols are—as a matter of law—job-related and consistent with business necessity. Indeed, they are uniformly applied, job-related for the conductor position, and consistent with business necessity because they are <u>mandated</u> by the FRA. *See, e.g., Albertson's*, 527 U.S. at 568; *Atkins v. Salazar*, 677 F.3d 667, 681-82 (5th Cir. 2011); *accord Turner* (Exh. A), p.8 ("although portions of the certification process are implemented by railways themselves… the process—including vision test approval, is within the province of the FRA… This requirement is *not* optional" for the railroad companies."). While Zaragoza tries to minimize UP's business necessity defense, a clear link exists between the color vision screening protocols being a business necessity due to the FRA mandating such and his disparate impact claim should be dismissed.

Finally, Zaragoza makes a loose assertion that UP acted with reckless indifference, entitling him to punitive damages. Yet he may recover punitive damages only if he demonstrates that UP engaged in "a discriminatory practice…with malice or with reckless indifference to the

federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The terms "malice" and "reckless indifference" "focus on the actor's state of mind" and both "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination [or retaliatory conduct]." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 439 (5th Cir. 2022) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)), cert. denied, U.S., 143 S. Ct. 745, 214 L.Ed.2d 449 (2023). That is not the case here. The undisputed evidence shows that UP acted directly under the guidance of federal law, which requires that conductors be recertified by the FRA, in removing Zaragoza from service when he failed to receive his recertification after failing both the valid Ishihara and Light Cannon test.

## CONCLUSION

For the foregoing reasons, the Court should grant UP summary judgment on Zaragoza's remaining claims of disparate treatment and disparate impact under the ADA.

Respectfully submitted this 19th day of May, 2025,

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

*/s/ Lara C. de Leon*
Lara C. de Leon (TX #24006957)
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (512) 382-8800
ldeleon@constangy.com

Katherine Serrano (TX#24110764)
1250 S. Capital of Texas Hwy,
Building 3, Suite 400
Austin, Texas 78746
Telephone: (512) 382-8808
kserrano@constangy.com

***Attorneys for Defendant***
***Union Pacific Railroad Company***

12

12888816v1

## CERTIFICATE OF SERVICE

I certify that on the 19th day of May, 2025 the foregoing was filed electronically with the Court, which served all counsel of record using its ECF notification system.

*/s/ Lara C. de Leon*
Lara C. de Leon
